THE STATE OF IOWA, Appellee, v. WM. B. GADBOIS *et al.*, Appellants.

| | |
|---|---|
| 89 | 25 |
| 90 | 538 |

| | |
|---|---|
| 39 | 25 |
| 103 | 725 |

| | |
|---|---|
| 89 | 25 |
| 115 | 132 |

| | |
|---|---|
| 89 | 25 |
| e119 | 332 |

| | |
|---|---|
| 89 | 25 |
| 125 | 146 |

| | |
|---|---|
| 89 | 25 |
| 134 | 154 |

| | |
|---|---|
| 89 | 25 |
| 135 | 51 |
| 135 | 72᠊ |
| 135 | 742 |

1. **Burglary:** CIRCUMSTANTIAL EVIDENCE. The defendants were convicted of burglary in the nighttime, upon evidence which was wholly circumstantial, but which is considered in the opinion, and held to be sufficient to support the verdict.

2. ———: COMPLICITY OF DEFENDANTS: EVIDENCE. Where the state claimed that the defendants were concerned jointly in the burglary for which they were indicted, and they had denied that they had ever met before their arrest, the state was properly permitted to prove that they had been seen together in several different places in Iowa during a period of nearly two years before the burglary was committed.

3. ———: EVIDENCE: SCHEDULE TIME OF TRAINS. Where, in a prosecution for burglary, it became material to show the times of the arrival and departure of trains at a certain time and place, *held*, that, it was competent to show the schedule of time for the trains at the time and place in question, without showing that they actually arrived and departed on that time.

4. ———: INTRODUCTION OF EVIDENCE: ORDER. Where, in a prosecution for burglary, several witnesses for the state, while it was introducing its evidence in chief, testified to the whereabouts of the defendants on a certain morning, and afterwards the defendants introduced evidence to show that they were in another county on the morning in question, *held*, that it was no abuse of the discretion of the court to allow the state to call other witnesses, after the defendants had rested, to testify that the defendants were in the place stated by its first witnesses at the time referred to.

5. ———: OFFER OF INCOMPETENT EVIDENCE: PREJUDICE: NEW TRIAL. In a prosecution for burglary, the county attorney offered, in the presence of the jury, to prove that the defendants had pleaded guilty to a burglary committed by them in another county. The evidence was rejected upon the defendant's objection, but the defendants, after a verdict of guilty, made the offer of the evidence a ground for a motion for a new trial. *Held*, that, while the offered evidence was clearly incompetent, and the very fact of offering it might have been prejudicial to the defendants, and the granting of a new trial on that ground would have been approved by this court, yet, whether the defendants were actually prejudiced was a question to be decided by the district court, in the exercise of a wise discretion, and, that court having denied a new trial on the ground stated, the supreme court would not interfere.

*Appeal from Benton District Court.*—HON. J. R. CALD-
WELL, Judge.

THURSDAY, OCTOBER 5, 1893.

THE defendants were accused of the crime of burglary in the nighttime, tried by jury, found guilty, and adjudged to be imprisoned in the state penitentiary at Anamosa at hard labor for the term of six years. From that judgment they appeal.—*Affirmed.*

*John Y. Stone*, Attorney General, and *Thos. A. Cheshire*, for the State.

*Burnham & Gaasch* and *D. E. Voris*, for appellants.

ROBINSON, C. J.—During the night of the twenty-ninth day of November, 1892, the store of W. H. Burrows & Company, in Belle Plaine, was broken into, and merchandise amounting in value to nearly three

hundred dollars was stolen from it. On the third day of the next month, the merchandise so taken was found packed in satchels and a box under the hay in certain hay barracks in the town of Watkins, about fifteen miles east of Belle Plaine. During the night of that day, the defendant William B. Gadbois was seen to enter the barracks, and was arrested soon after he left them, and his codefendant, L. F. Widner, was arrested during the same night, within a short distance of the town.

I. The appellants contend that the evidence was not sufficient to authorize a conviction of either of them. They were not seen to commit the offense of which they are charged, none of the stolen property was found in their possession or under their control, and they have not admitted their guilt. To sustain their conviction the state relies wholly upon circumstantial evidence, which shows substantially the following: At the time of the burglary, Gadbois resided in Cedar Rapids, thirty-five miles east of Belle Plaine; and Widner at Marion, a few miles further away. Cedar Rapids, Belle Plaine, and Watkins are on the main line of the Chicago and Northwestern Railway, and trains pass each way through them during the nighttime. A witness testified that he saw the defendants in Belle Plaine at 3 o'clock in the afternoon of the day which preceded the burglary, near the store which was broken into; and another, who was a car repairer, states that he saw them in the railway yards about 9 o'clock in the evening, that he talked with them, and that they asked about the trains going out. He also stated that he saw them in a store in the town an hour or two earlier. A witness testified that at about 7:30 o'clock in the morning of November 30, 1892, he saw through a church window in Watkins, two men moving about. He started for the church, but before he

1. BURGLARY: circumstantial evidence.

arrived two men left it and went away. They resembled the defendants, and he thinks, although he is not positive, that they were the defendants. Several witnesses testify that, between 8 and 9 o'clock that morning, the defendants took breakfast at the house of Joseph Brecht, two and one half miles southeast of Watkins. They wore their hats pulled down over their foreheads while eating, and remained but a few minutes. An hour or two later they were seen about five miles southeast of Watkins. In the evening of December third, soon after the 10 o'clock train came in from the east, Gadbois was seen, by persons watching, to come around a corner about twenty-five yards north of the hay barracks. He walked towards the barracks, looked around, and then walked towards a church, which was about fifty yards in a northeasterly direction from the barracks. He walked about thirty yards, and looked west toward the schoolhouse; then walked back of the barracks, and whistled twice; then walked towards the church again, looked around, and came back, went into the barracks, and remained but a short time; then came out and walked rapidly northward to the corner; then turned west towards the school house, which was about two and one half blocks west, and a little north of the barracks. When he turned west, the watchers, among whom was the sheriff, followed him. The sheriff called to him to "halt," when he started to run. The sheriff fired a shot at him, and, after running about a block, he stopped, and was arrested. He was taken to a house, and asked where his partner was, and said he had no partner. He was then asked what the whistling was for, and answered, "I have nothing to say." He afterwards said, speaking of himself, that his name was Harry Dustan, and that he lived in Chicago. At a little after 10 o'clock, a man wearing a stiff hat and a light overcoat was seen driving a black horse westward,

about half a mile north of the town.    Soon after that time a man wearing a light overcoat was seen to walk eastward towards the church, along a street which led from the direction of the schoolhouse, and in a very short time he was seen to go westward towards the school house.    Being informed. that a man had been seen going toward the barracks, the sheriff and a companion followed him, going north from the school house.    After driving about a half mile they overtook the defendant Widner, who was driving a black horse attached to a roadwagon, and was wearing a stiff hat and light overcoat like that worn by the man who had been seen going westward north of Watkins, and eastward from the schoolhouse and. then westward in Watkins.    He was ordered several times to stop, but refused to do so until a gun was aimed at him.    He stated that he had been visiting relatives at Millersburg, and was going to Marion.    Millersburg is about thirty miles south of Watkins, and Marion is about the same distance in a northeasterly direction.    The next morning he said he came from the south; that he had tied his horse by a schoolhouse or church, and had gone up town for feed for him, but having no money, and not wishing to beg, he went back.    He and Gadbois, when arrested, said they had never seen each other before.    The evidence showed that they had been seen together repeatedly before the robbery. Widner hired the horse and wagon he was driving, when arrested, in Marion, at about 1 or 2 o'clock in the afternoon of December 3, telling the owner at the time that he wished to go to Linn Grove, a place about five miles away.

Much testimony was given in behalf of the defendants, which tended strongly to show that Gadbois was in Cedar Rapids and Widner in Marion when the robbery was committed; and the testimony of the witnesses who claim to have seen the defendants in Belle

Plaine the day before and evening of the robbery is contradicted.   But several witnesses who testified to the presence of the defendants at their homes at about the time the burglary was committed were impeached, and the testimony of others is in some respects improbable.   The numerous witnesses who testified to having seen the defendants near Watkins the morning following the burglary, when their witnesses say they were in Linn county were wholly disinterested, and it is not probable that all of them were mistaken.   They identified the defendants by their faces, their general appearance, their dress, and by certain peculiarities specified. If their testimony is true, that of several of the witnesses for the defendants was necessarily false.   If the defendants were in and near Watkins during the morning following the burglary, and whether they were or not was a question for the jury to determine, then we are satisfied that the defendants are guilty of the offense charged.   And even if they were not there at that time, their actions and statements immediately preceding and following their arrest can not be explained on any other reasonable hypothesis than that they were acting in concert, and had a criminal connection with the burglary, if they were not the sole perpetrators of it.   We conclude that the evidence to sustain a conviction is sufficient.

II.   The appellants complain of the ruling of the court in permitting the state to prove that the defend-

2. ——: complicity of defendants: evidence.

ants had been seen together in several different places in Iowa during a period of nearly two years before the burglary was committed.   There was no error in those rulings. The defendants had denied that they ever met before their arrest, and the state claimed that they were concerned jointly in the burglary.   It was important to the state to show that the defendants had associated with each other before the burglary was committed, in

order that the statements made by them when arrested might be considered and given due weight in connection with other circumstances which tended to show their guilt.

III. The state was permitted to prove the schedule time for the arrival of trains at Belle Plaine. The defendants complain of the admission of evidence of that character without proof that the trains arrived during the time in question on schedule time. The proof admitted tended to prove that it was customary for trains to arrive at certain hours, and we think it was admissible as tending to prove that they did so arrive at about the time the burglary was committed.

*3. ——: evidence: schedule time of trains.*

IV. While the state was introducing its evidence in chief, several witnesses testified to having seen the defendants at the house of Joseph Brecht on the morning of November 30th. After the defendants had submitted the evidence on their part, the state was permitted to introduce new witnesses, who also testified to having seen the defendants at Brecht's at the time stated. In admitting the testimony of the new witnesses there was no error. It is true, it might have been given as evidence in chief for the state, but it was also rebutting in its character. After the state rested, the defendants introduced evidence which tended to show that they were in Linn county at the time witnesses for the state located them in and near Watkins. The testimony in question tended to rebut that evidence. It may be true, as claimed by the state in argument, that it had no knowledge of the intention of the defendants to endeavor to show that they were in Linn county when the burglary was committed, and that it was not deemed necessary to prove by more than one or two witnesses that they were in and near Watkins on the morning of November 30th, until it was known that

*4. ——: introduction: evidence: order.*

the defendants denied that such was the case. Under these circumstances it was within the discretion of the district court to permit further proof on the part of the state to show where they were at the time in question.

V. During the progress of the trial the state introduced the clerk of the district court of Linn county, who was permitted to state, against the objections of the defendant, that he had with him the criminal records of Linn county for the period of time commencin October, 1884, and ending in October, 1891. The witness was then asked this question: "Will you now please examine the criminal record of Linn county, Iowa, which you say you now have in your possession, and present in court, and state to this jury as to whether or not that criminal record discloses the fact that William B. Gadbois and L. F. Widner have within that period of time been convicted of the crime of burglarizing a hardware store jointly, in Marion, county of Linn, and state of Iowa; and further, if that record discloses the fact that the defendants, William B. Gadbois and L. F. Winder, did plead guilty to the charge of burglarizing the hardware store, and that they were upon their plea of guilty sentenced by the district court of Linn county, Iowa, to a term in the Anamosa penitentiary?" The defendants here objected to the question as incompetent, irrelevant and immaterial. Before there was a ruling on the objection the county attorney added to the question the following: "And does not that record disclose the further fact that D. E. Voris, of Marion, was the attorney for the defendant Widner in that case?" The defendants made the same objection to the question as amended, and it was sustained. They complain of the action of the county attorney in asking the question, and claim, in effect, that the ruling of the court in sustaining an objection to it did not cure the evil effects. Certainly there is much in this

5. ——: offer of incompetent evidence: prejudice: new trial.

claim. A person can not be proven guilty of one offense by showing that he committed another. No theory occurs to us, and none has been suggested, which justified the asking of the question. Counsel for the state do not attempt to defend it, but say that the only objection made to the question in the district court was sustained; therefore, that the defendants have no grounds for complaint. The defendants could do no more, when the question was asked, than to object to it, and when they were found guilty by the jury they made the misconduct of the attorney one of the grounds upon which it was based. We think they thus brought the matter properly before the court. The course of the attorney can not be approved. His purpose in having the clerk of the district court of Linn county produce in the presence of the jury and identify the record of criminal convictions which he described, and in asking the question set out, seems to have been to prejudice the jury against the defendants by incompetent means. What was done and said may well have led the jury to believe that the defendants had been guilty of the crime of burglary before the offense for which they were on trial was committed, and thus have inclined them to weigh less carefully than they should have done the evidence submitted, and to agree too readily to a verdict of guilty. Had the district court found that the unanswered question was prejudicial to the defendants, and had it sustained the motion for a new trial on that ground, we should have thought its action commendable. See *George v. Swafford*, 75 Iowa, 496. But improper questions are sometimes asked in good faith, without any sinister motive, and when objections to them are sustained the fact that they were asked should not be deemed sufficient ground for a new trial unless there is, at least reasonable presumption that prejudice has resulted from them. Whether there is such a presumption must in most cases depend upon circum-

stances and conditions which are peculiarly within the knowledge of the trial court. In this case the jury were charged carefully and at considerable length in regard to the quality and weight of evidence necessary to convict. It is possible that the objectionable question was not asked with any wrongful intent, and the district court has said that it did not constitute a sufficient ground for a new trial. We can not say that it erred in that respect.

We have examined the record with care, but do not find cause to disturb the judgment of the district court. It is, therefore, AFFIRMED.